# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **KYLE SIMS** : <br> 4991 Vicksburg Lane : <br> Hilliard, OH 43026 : <br> : <br>     Plaintiff, : <br> : <br> vs. : <br> : <br> : <br> **NETJETS, INC.** : <br> 4111 Bridgeway Avenue : <br> Columbus, OH 43219 : <br> : <br>     Defendant. : | CASE NO. 2:25-cv-1445 <br><br> JUDGE <br><br> MAGISTRATE JUDGE <br><br> **Jury Demand Endorsed Hereon** |

## COMPLAINT

NOW COMES Plaintiff Kyle Sims ("Plaintiff") and proffers this Complaint for damages against Defendant NetJets Inc. ("Defendant").

## THE PARTIES

1. Plaintiff is a natural person residing in Franklin County, Ohio. Plaintiff brings this action to redress injuries committed against him as a result of Defendant's actions.

2. Defendant is a corporation that conducts business and maintains operations within the Southern District of Ohio.

3. At all relevant times, Plaintiff was an employee as that term is defined by 29 U.S.C. § 2611(2) and the Family Medical Leave Act ("FMLA").

4. Defendant is an "employer" as defined by 29 U.S.C. § 2611(4)(A) and the FMLA.

5. Defendant is engaged in commerce, or an industry or activity affecting commerce, and always employed 50 or more employees for each working day during each of 20 or more calendar workweeks during Plaintiff's employment.

## JURISDICTION AND VENUE

6. All counts contained herein are brought pursuant to the laws of the United States, therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

7. This action is brought pursuant to the FMLA, 29 U.S.C. § 2611, and 28 U.S.C. §1331.

8. Venue is proper pursuant to 28 U.S.C. § 1391, because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio, Plaintiff performed his job duties there, and Defendant is doing and has done substantial business in the Southern District of Ohio.

9. Plaintiff has complied with all jurisdictional prerequisites to the filing of this lawsuit.

## FACTUAL BACKGROUND

10. Plaintiff was hired by Defendant on or about February 27, 2023, as a Safety & Compliance Program Manager.

11. Plaintiff worked in this position until or around May 17, 2024, when he subsequently was promoted to the position of Director, Safety Assurance.

12. Plaintiff was responsible for five different groups: emergency response, environment health and safety, fatigue risk management, internal evaluations, drug and alcohol.

13. On or around May 22, 2025, Plaintiff exercised his right under the FMLA and took leave for the birth of his son.

14. Plaintiff was approved for FMLA leave beginning on or around May 22, 2025, with an end date of on or around August 17, 2025.

15. When Plaintiff first informed his supervisors that he was utilizing the full 12 weeks he was entitled to under the FMLA, he was met with negative comments.

16. His Vice President at the time, Eric McCarty, asked, "Are you sure you want to take all of that time off?", as well as "are you sure you're going to come back if you're going to be gone all that time?"

17. Once the new Vice President, Mark Kleinhans began, Plaintiff informed him of his upcoming FLMA leave.

18. Mr. Kleinhans turned quickly and snapped his head towards Plaintiff and questioned him for taking off the full 12 weeks.

19. Mr. Kleinhans seemed shocked to learn that Plaintiff was exercising his FMLA right to the full 12 weeks of leave.

20. On or around May 22, 2025, Plaintiff went on his scheduled and pre-approved FMLA leave.

21. Plaintiff returned to work as scheduled on or around August 18, 2025.

22. On the very same day he returned, Plaintiff was informed of an alleged regulatory audit that exposed issues in a program he oversaw.

23. The second day after Plaintiff returned to work, Defendant' Executive Vice President of Safety, Richard Meikle, asked Plaintiff without prompting whether it was Plaintiff' first day back from FMLA leave.

24. When Plaintiff stated that it was only his second day after returning but that it was good to be back at work, Mr. Meikle stated "give it a few more days and you won't be saying that any longer."

25. The assumed preliminary findings from the investigation revealed that Sue Snyder (a subordinate of Plaintiff) was not accurately logging the names of those employees who were eligible for drug testing (the safety sensitive pool), which is a requirement of the Federal Aviation Administration ("FAA").

26. The internal investigation revealed that about .6% of the safety sensitive pool was missing per quarter.

27. The safety sensitive pool consisted of about 4,200 employees.

28. The investigation encompassed a three year look back, which showed that the subordinate had been doing this for over three years.

29. However, Plaintiff had only held his current position for one year.

30. Following the preliminary investigation, the Vice President of Safety, Mr. Kleinhans, reassured Plaintiff that there was no possible way that he could have known about this issue but for the audit.

31. Mr. Kleinhans reassured Plaintiff multiple times that this issue "predates" him and that he would not be terminated because of this investigation.

32. Plaintiff was verbally assured by Mr. Kleinhans that he and Mr. McCarty would only receive a verbal write-up for this investigation, since Ms. Snyder was their subordinate, and they had no way of knowing this was happening but for an audit.

33. Mr. Kleinhans also assured Plaintiff that no one would be terminated to comply with the company's idea of fostering a "just safety culture."

34. Plaintiff's supervisor, Mr. McCarty, was not terminated because of the investigation.

35. Less than three weeks after returning from his FMLA leave, Plaintiff was informed on or around September 5, 2025, that he was terminated effective immediately.

36. Plaintiff inquired as to the reason why he was being terminated but was not provided with one.

37. Defendant's conduct suggests that they utilized the internal investigation as pretext for terminating him for utilizing his FMLA leave.

38. As of that point, the FAA had not provided a final audit report regarding the allegations.

39. Instead, Plaintiff was notified of the internal investigation on the same exact day that he returned from his FMLA leave and he was 3 ultimately terminated less than 3 weeks after his return from leave.

## COUNT I
### Retaliation - Violation of the Family Medical Leave Act

40. Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten here.

41. Plaintiff engaged in protected activity when he exercised his rights under the FMLA by taking approved leave beginning on or around May 22, 2025, through on or around August 17, 2025, for the birth of his son.

42. Defendant was aware of Plaintiff's FMLA leave, as his request and full 12-week entitlement were formally approved and communicated to his supervisors.

43. Before Plaintiff began his leave, multiple supervisors expressed negative discouraging comments regarding his intention to use the full 12 weeks of FMLA leave.

44. Plaintiff returned to work on or around August 18, 2025, and was immediately informed of an internal investigation concerning a compliance issue that predated his tenure in the role and related to a subordinate's conduct.

45. Despite prior assurance from management that Plaintiff would not be terminated as a result of this investigation, Defendant terminated Plaintiff less than three weeks after his return

5

from FMLA leave, on or around September 5, 2025.

46. Defendant's stated reasons for termination are pretextual, as the investigation concerned conduct occurring years before Plaintiff assumed the position, his supervisor was not terminated, and several managers exhibited open hostility toward Plaintiff's use of FMLA leave.

47. The close temporal proximity between Plaintiff's protected leave and his termination, combined with management's negative comments and inconsistent explanations, established a causal connection between Plaintiff's FMLA leave and his termination.

48. Defendant's violations of the Family and Medical Leave Act entitles Plaintiff, pursuant to 29 U.S.C. § 2617(a), to monetary damages which include back pay and benefits, statutory liquidated damages, and attorneys' fees and costs of bringing this litigation, in an amount to be determined at trial.

WHEREFORE, Plaintiff demands:

For all Counts, monetary damages including back pay and benefits, statutory liquidated damages, expert witness fees and attorneys' fees and costs, and front pay, compensatory damages and punitive damages in an amount to be determined at trial, but in any event not less than $75,000.00 and any and all other relief, which the Court deems just and appropriate.

Respectfully submitted,

/s/ *Rachel Sabo Friedmann, Esq.*
Rachel Sabo Friedmann (0089226)
Truman Haycock (0104825)
**The Friedmann Firm LLC**
3740 Ridge Mill Drive
Hilliard, OH 43026
Rachel@TFFLegal.com
Truman@TFFLegal.com
(614) 654-8233 (Phone)
614-737-9812 (Fax)

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/ *Rachel Sabo Friedmann, Esq.*
Rachel Sabo Friedmann (0089226)